

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*United States Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

August 1, 2014

Hon. Vincent L. Briccetti
United States District Judge
United States Courthouse
300 Quarropas Street
White Plains, New York 10601

> Re:  <u>United States</u> v. <u>Lowe</u>, 13 Cr. 985 (VB)

Dear Judge Briccetti:

The Government respectfully submits this letter in support of its motions <u>in limine</u> to admit evidence of various acts by the defendant pursuant to Federal Rule of Evidence 404(b) to show knowledge, intent, willfulness, motive and absence of mistake or, in some instances, as direct evidence of the charged crimes.  The Government also moves <u>in limine</u> to preclude the defendant from presenting evidence relating to his expenses or to his tax preparer's unrelated conviction because any such evidence would be irrelevant and would tend to mislead the jury and waste time.

I.    <u>The Offense Conduct and Proffered Evidence</u>

The offenses charged in the Indictment can be broken down into three general categories:  a) defrauding the New York Democratic Senate Campaign Committee ("DSCC") of $100,000 (Counts 1 and 2); b) tax offenses (Counts 3 through 8); and c) mortgage fraud (Count 9).

A.    <u>Fraud on the DSCC</u>

The defendant was a self-employed political consultant who operated through three different limited liability companies: Prestige Strategic Communications ("Prestige"); G&L Consulting ("G&L") and Berachot.  In or about June 2009, the DSCC retained the defendant through Prestige to provide consulting services. The DSCC also retained the defendant in the guise of G&L in or about April 2010.  The DSCC paid the defendant a total of more than $265,000 in consulting fees.

In June 2010, the defendant caused the DSCC to award a $100,000 contract, ostensibly for printing, to Vendor #1, a New Jersey-based political consulting firm.  When the DSCC balked at making a $100,000 payment to a vendor without an invoice, the defendant arranged for Vendor #1 to submit an invoice for "printing" in that amount.  Senator #1, a leader in the New York State Senate, approved the payment.  The DSCC wired $50,000 to Vendor #1 on June 8 and the remaining $50,000 on June 16.

The defendant directed a principal of Vendor #1 to distribute $75,000 of that money to him through Prestige and $20,000 to a political consultant based in New York City ("Political Consultant #1").  Political Consultant #1 will testify that he received this $20,000 shortly after asking Senator #1 for financial assistance and that he believed the payment was a benefit to him for assistance that he had previously provided to Senator #1.  The defendant told the principal of Vendor #1 that he could keep the remaining $5,000.

The defendant used the $75,000 he received to install a pool and a home theater and to renovate his basement at his Georgia house.[1]  The evidence will show that the defendant demanded that the pool be completed by that July 4, as he intended to have a party at his home that day.  The defendant negotiated the contract for the pool in early June and signed the contract on June 11, 2010 for a total of $56,100.  He made the first payment of $10,000 toward the pool on that date and construction of the pool started immediately.  The $75,000 was gone within a matter of weeks.

Until September 2010, neither the defendant nor Vendor #1 did any work for the DSCC to justify the $80,000 they received in total.  On August 31, 2010, an article appeared in a periodical focused on politics in the state capital questioning the $100,000 payment to Vendor #1.  The defendant read the article.  In an effort to create a cover story, the defendant

---

[1] The defendant was a resident of Manhattan during the time relevant to the Indictment.  He bought a second home in Georgia (the "1829 house") in July 2007.  His application for a mortgage for that home is the subject of Count 9.  He and his wife bought the directly adjoining property (the "1833 house") in September 2007.  His wife obtained a mortgage loan for that property.  The defendant treated the adjoining homes as one property and had the pool installed at the 1833 house.  For ease of reference, the Government will refer to both properties as the defendant's property.

asked Vendor #1 a few weeks later -- and three months after the
DSCC made the payment to Vendor #1 -- to prepare some political
ads.  Vendor #1 retained a graphic artist in Florida to do so
and paid the artist $5,000.  The DSCC never used the ads.  It
had retained another consultant to prepare political ads for the
2010 election cycle.

### B.  Tax Offenses

From 2007 through 2012, the defendant received a total of
more than $2.1 million in income from various consulting
clients.  For example, he received approximately $965,000 from
entities related to developer Forest City Ratner; more than
$537,000 from entities related to Lettire Construction; more
than $150,000 from the Committee to Re-elect John Sampson (the
"Sampson Committee"); and approximately $265,000 from the DSCC.
The defendant operated through his limited liability companies
and therefore was not subject to withholding.  He made no
estimated tax payments.

The defendant reported very little of this income on his
tax returns.  In November 2010, he filed tax returns for 2007,
2008 and 2009 in which he reported only $21,903, $26,331 and
$25,000 respectively in gross receipts from his consulting
companies.  The defendant never filed any tax returns for 2010,
2011 and 2012.

### C.  Mortgage Fraud

In July 2007, the defendant obtained a mortgage loan from
Premium Capital in the principal amount of $228,720 to buy the
1829 house.  As part of the application process, he signed a
"Verification of Deposit" form to permit Premium Capital to
verify the balance of his checking account at Commerce Bank.
The defendant caused the assistant manager of his local Commerce
Bank branch, who was a friend, to intercept the form and fill it
out himself.  The assistant manager did so, claiming that the
defendant's checking account had a balance of more than $80,000
when, in fact, the balance was $2,156.  The assistant manager
also reported on the form that the average balance over the
previous two months in the defendant's account was more than
$78,000 when the maximum balance in the account during those two
months was $10,003.

D.  <u>The Proffered Evidence</u>

The Government seeks to admit evidence regarding the following acts:

1.  <u>Evidence Relating to the Tax Offenses</u>

a.  <u>Prior Filing History</u>:  The defendant failed to file tax returns for the years 2000 through 2009 until November and December 2010, when he filed returns for 2000 and 2004 through 2009.  He has never filed returns for 2001 through 2003. Starting in 2002, the Internal Revenue Service ("IRS") sent the defendant inquiries about his failures to file returns.  In addition, the defendant failed to report all his income from his consulting businesses on at least his 2006 return.  For example, the defendant's bank records show he received more than $250,000 in gross receipts in 2006.  He only reported $15,300 in gross receipts on the 2006 return he filed with the IRS.

b.  <u>Use of False Tax Returns</u>:  The defendant submitted false prepared tax returns for 2008 and 2009 to a potential landlord that showed significantly more income than the corresponding returns he filed with the IRS.  These returns had been prepared by the same tax preparer the defendant used to prepare the 2008 and 2009 returns that he filed with the IRS.

2.  <u>Evidence Relating to the DSCC Fraud</u>

a.  <u>Bad Checks</u>:  The defendant wrote checks drawn on insufficient funds to make some of the payments to his pool contractor.  He wrote the first check to the contractor on June 11, two days after he began to receive his $75,000 portion of the $100,000 he took from the DSCC.  The pool contract required the defendant to make payments as the construction progressed. The defendant ran out of money within weeks and his checks to the pool contractor began to bounce.  The defendant similarly failed to pay the final $6,000 towards the $40,000 cost of the home theater installation and basement renovations he was having done at the same time the pool was being installed.

b.  <u>Expenses Charged to DSCC Credit Card</u>:  Since he had run out of money, the defendant needed to find a way to pay for the remaining expenses arising from the installation of his new pool and home theater and renovation of his basement.  From June 26, 2010 through July 4, 2010, the defendant charged more than $27,000 to his DSCC-issued American Express card to pay for indoor and outdoor furniture, electronics, billiards equipment

4

and travel expenses.  When the DSCC received the bill for these
items, it demanded, and received, payment from the defendant
after it paid the defendant a $50,000 "post-filing bonus."

### 3.  Evidence Relating to the Mortgage Fraud

a.  Defrauding John Doe:  The defendant purchased
the 1829 house in 2007 in part with funds he borrowed from John
Doe, a resident of Yonkers, with the promise that he would repay
the money within days.  The defendant gave Doe a check drawn on
insufficient funds as repayment of the loan.  He then promised
on several occasions to pay Doe back when he had the funds but,
despite having sufficient cash balances at times to repay Doe,
he never did so.

## II.  Argument

### A.  The Defendant's Prior Filing History is Admissible to Prove Knowledge, Intent, Motive, Plan and Absence of Mistake

The defendant's prior filing history is admissible pursuant
to Federal Rule of Evidence 404(b) to show his knowledge of his
legal duties to file tax returns; his intent to evade that legal
duty; his motive to lower the amount of taxes due; his plan to
lower the amount of taxes due; and the absence of any mistake on
the defendant's part regarding the amounts of his his gross
receipts in the charged years or his legal duty to file accurate
tax returns.

Federal Rule of Evidence 404(b) provides, in relevant part,
that:

> Evidence of other crimes, wrongs, or acts is not admissible
> to prove the character of a person in order to show action
> in conformity therewith.  It may, however, be admissible
> for other purposes, such as proof of motive, opportunity,
> intent, preparation, plan, knowledge, identity, or absence
> of mistake or accident . . .

Fed. R. Evid. 404(b).  It is well-settled that "other acts"
evidence is admissible under Rule 404(b) as long as the
evidence: 1) is advanced for a proper purpose; 2) is relevant to
the crimes for which the defendant is on trial; and 3) has
probative value that is not substantially outweighed by any
unfair prejudicial effect.  United States v. Scott, 677 F.3d 72,

79 (2d Cir. 2012); United States v. Guang, 511 F.3d 110, 121
(2d. Cir. 2007).

    The Second Circuit takes an inclusionary approach to the
admission of prior act evidence, under which evidence of prior
crimes, wrongs, or acts is admissible for any purpose other than
to show a defendant's criminal propensity so long as it is not
substantially outweighed by the danger of unfair prejudice.
United States v. Moran-Toala, 726 F.3d 334, 345 (2d Cir. 2013);
United States v. Paulino, 445 F.3d 211, 221 (2d Cir. 2006);
United States v. Teague, 93 F.3d 81, 84 (2d Cir. 1996) (proof of
state of mind, such as intent, is "proper purpose" of other
crimes evidence); United States v. Ortiz, 857 F.2d 900, 903 (2d
Cir. 1988) ("[O]ther acts or crimes are admissible under Rule
404(b) to prove matters other than the defendant's criminal
propensity").  Trial courts have broad latitude in determining
whether to admit evidence pursuant to Rule 404(b), and their
rulings will be reviewed only for abuse of discretion.  United
States v. Guang, 511 F.3d 110, 121 (2d. Cir. 2007); United
States v. Mitchell, 328 F.3d 77, 82 (2d Cir. 2003).  The court
should give an appropriate limiting instruction if one is
requested.  United States v. Zackson, 12 F.3d 1178, 1182 (2d
Cir. 1993); United States v. Ramirez, 894 F.2d 565, 568 (2d Cir.
1990).

    The Government will offer evidence that the defendant
failed to file any tax returns for the years 2000 through 2009
until late 2010.  On November 26, 2010 and December 8, 2010, the
defendant filed returns for 2000 and 2004 through 2006, as well
as returns for 2007 through 2009, which are the subjects of
Counts 3 through 5 respectively.  The defendant has never filed
returns for 2001 through 2003.  Between 2002 and 2010, the IRS
mailed the defendant written inquiries about his failures to
file his tax returns.  The evidence will further show that the
defendant understated substantially his income from his
consulting businesses on at least his 2006 return, as well as
his returns for the charged years of 2007 through 2009.

    Evidence of the defendant's filing history for the
uncharged years of 2000 through 2006 is admissible for several
appropriate purposes under Rule 404(b).  First, it shows the
defendant's knowledge of his legal duty to file tax returns and
any absence of mistake of law regarding that duty, which the
Government must prove with respect to the failure to file
charges relating to 2010 through 2012 in Counts 6 through 8.
The written inquiries the IRS sent the defendant regarding his
failures to file timely returns starting in 2002 put the

defendant on notice of that legal duty.  Accordingly, the prior
filing history is highly probative of willfulness because it
shows that a particular defendant's alleged violation of the
federal tax laws was an intentional violation of a known legal
duty and not due to inadvertence, mistake, or confusion as to
what was required by the federal tax laws.  United States v.
Bok, 156 F.3d 157, 165-66 (2d Cir. 1998)("As we have often
explained, a defendant's past tax-paying record is admissible to
prove willfulness circumstantially"); United States v. Magnus,
365 F.2d 1007 (2d Cir. 1966)(prior state taxpaying history
admissible and probative of willfulness in failing to pay
federal taxes in later years).

     Second, the defendant's prior filing history shows both the
defendant's motive to lower the amount of taxes due and his plan
to do so.  The defendant filed tax returns for several years --
2000 and 2004 through 2009 -- all at the same time in late 2010.
Since he had operated through his own limited liability
companies, he generally had not been subject to withholding.  He
received  a credit for $2,804 in withholding for 2000 only.  He
made no estimated tax payments in any of those years.  As a
result, when the defendant filed his returns in 2010, he was
facing an enormous tax liability, even without interest or
penalties.  The defendant simply did not have the resources to
make that payment.  He had been unable to complete his payments
on his pool, home theater and basement renovations only four
months before.  His financial condition had only worsened, as he
had just lost his two most lucrative clients, the DSCC and the
Sampson Committee, only a few weeks before he filed the returns
in late 2010.  As of that time, the defendant certainly had a
motive to lower his tax liability.  The evidence shows that his
two part plan to do so was:  1) to understate his receipts from
his consulting businesses -- a plan he executed on his 2007,
2008 and 2009 returns, which are the subjects of Counts 3, 4 and
5 respectively, as well as on at least his 2006 return; and 2)
to ignore some years entirely, as he did for 2001 through 2003
and again in 2010 through 2012, which are the subjects of Counts
6, 7 and 8 respectively.

     Third, the defendant's prior filing history shows an intent
to evade the tax system.  The Second Circuit has routinely
approved the admission of evidence of uncharged tax crimes in
tax cases where the defense has put intent in issue. Bok, 156
F.3d at 165-66 ("evidence of defendant's failure to file personal
and corporate state income tax returns for years prior to
prosecution years is "indicative of an intent to evade the tax
system"); United States v. Myerson, 18 F.3d 153, 165-66 (2d Cir.

1994)(where defendant denied desire to cheat on taxes, evidence of other similar transactions admissible under Rule 404(b)); United States v. Collorafi, 876 F.2d 303, 305 (2d Cir. 1989) (due to willfulness requirement in tax cases, "trial courts should follow a liberal policy in admitting evidence directed towards establishing the defendant's state of mind"); United States v. Ebner, 782 F.2d 1120, 1126 n.7 ("jury may consider evidence of intent to evade taxes in one year as evidence of intent to evade payment in prior or subsequent years").

Fourth, the defendant's prior filing history shows that his understatements of his gross receipts in the charged years of 2007, 2008 and 2009 were not mistakes.  The defendant could not have been mistaken about his gross receipts for so many years. Further, his pattern of failing to file returns for years, only then to file returns for some of those years at the same time -- and thereby be unable to pay his full tax liability, much less interest and penalties -- shows that he was not mistaken when he underreported his income.  He just could not pay the full amount of taxes he owed, so he needed to manipulate his filings to reach an amount he could pay by understating income in some years and ignoring other years outright.

The uncharged conduct for the 2000 through 2006 tax years is of precisely the same ilk as the charged false subscription and failure to file conduct for 2007 through 2012, and is therefore no more sensational or inflammatory.  It occurred close in time to the charged conduct, and provides necessary context for it.  The evidence of it will be simple, straightforward and brief.  Indeed, the only likely witness to establish the 2000 through 2006 conduct will be an IRS representative who will be testifying anyway.  Most importantly, the uncharged conduct is highly probative of what will surely be disputed issues – the defendant's knowledge and intent -- and therefore will assist the jury in deciding the case. Accordingly, the defendant's prior filing history should be admitted.

     B.    The Defendant's Submission of False Tax Returns
              To His Landlord is Admissible as Direct Evidence
              Of the  Charged Tax Offenses and, Alternatively,
              To Show Knowledge, Intent and Absence of Mistake

In August 2010, the defendant applied to rent a two bedroom apartment at the Tapestry, an upscale building in Harlem.  The Tapestry had been developed and built by Lettire Construction, one of the defendant's clients.

On September 20, 2010 -- more than two months before the defendant actually filed returns for 2008 and 2009 -- the defendant's tax preparer faxed purported copies of the defendant's tax returns for those years to the Tapestry's management office.  These returns showed substantially more income than the defendant eventually reported on the 2008 and 2009 returns he filed with the IRS that had been prepared by the same tax preparer.  For 2008, the defendant claimed $249,891 in gross receipts on the return he gave to the Tapestry.  The defendant reported $26,331 in gross receipts to the IRS for 2008.  For 2009, the defendant claimed $250,000 in gross receipts on the return he gave to the Tapestry.  He reported $25,000 in gross receipts to the IRS for 2009.  The defendant understated his gross receipts even on the Tapestry returns.  As the indictment charges, the defendant's actual gross receipts for 2008 were $310,459, as opposed to the $249,891 he showed on the Tapestry return for that year.  Similarly, the defendant's actual gross receipts for 2009 were $310,953, as opposed to the $250,000 he showed on the Tapestry return for that year.

The defendant's acts in causing both the preparation of the false returns and their submission to the landlord are admissible as direct evidence of the false subscription counts for the 2008 and 2009 tax years (Counts 4 and 5).  The fake returns are direct admissions by the defendant that his real gross receipts and total income figures for 2008 and 2009 were higher, or at least different, than those he reported on the 2008 and 2009 returns he later filed with the IRS.  In order to authenticate the returns under Fed. R. Evid. 901, the Government will call a representative of the Tapestry to testify that it received the fake returns as part of the defendant's application for an apartment.  Evidence of the defendant's submission of the fake returns to the Tapestry is therefore admissible with evidence of his admissions on the fake returns because that submission is inextricably intertwined with the defendant's statements on the returns and is necessary to provide the context for those admissions.  That context is relevant because it would permit the jury to infer that the defendant authorized the preparation of the fake returns -- and that the admissions on them are his -- based on evidence that the returns were used to support the defendant's application for an apartment that he had filled out a few weeks before.  The context is also relevant to show that the returns were not a mistake by the tax preparer or that they were prepared as a joke.  "To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the

charges can have that tendency." United States v. Gonzalez, 110
F.3d 936, 941 (2d Cir. 1997).  As the Second Circuit explained
in Gonzalez:

> Relevant evidence is not confined to that which directly
> establishes an element of the crime. . . . [T]he trial
> court may admit evidence that does not directly establish
> an element of the offense charged, in order to provide
> background for the events alleged in the indictment.
> Background evidence may be admitted to show, for example,
> the circumstances surrounding the events or to furnish an
> explanation of the understanding or intent with which
> certain acts were performed.

Id. (citations omitted).  The Court of Appeals has held that
"[e]vidence of uncharged criminal activity is not considered
other crimes evidence under Fed. R. Evid. 404(b) if it arose out
of the same transaction or series of transactions as the charged
offense, if it is inextricably intertwined with the evidence
regarding the charged offense, or if it is necessary to complete
the story of the crime on trial." United States v. Carboni, 204
F.3d 39, 44 (2d Cir. 2000)(internal quotation marks omitted);
see United States v. Quinones, 511 F.3d 289, 309 (2d Cir. 2007)
(same); United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994)
("evidence of other bad acts may be admitted to provide the jury
with the complete story of the crimes charged by demonstrating
the context of certain events relevant to the charged offense").
In such circumstances, the uncharged crime evidence is
appropriately treated as "part of the very act charged," or, at
least, proof of that act.  United States v. Concepcion, 983 F.2d
369, 392 (2d Cir. 1992).

In the alternative, evidence of the preparation of the fake
returns and their submission to the Tapestry is admissible for
several proper purposes under Rule 404(b).  First, his acts show
his knowledge that his subsequently filed returns were
inaccurate.  The defendant kept two sets of returns and used
them for different purposes.  The jury will be free to draw the
inference that at least the lower income numbers, which were
reported to the IRS, were inaccurate and that the defendant was
aware of it.  The fact the defendant caused the submission of
supposedly filed returns to his landlord also shows his
knowledge as of September 2010 that he had a legal duty to file
tax returns.  That knowledge is relevant to show that the
defendant knowingly and willfully disregarded that duty when he
failed to file returns for 2010, 2011 and 2012 as charged in
Counts 6, 7 and 8 respectively.  The defendant's knowing and

willful disregard of that duty is also evidence of his intent to
avoid paying taxes.  Finally, the fact that the defendant
essentially kept two sets of tax books and filed the lower set
with the IRS shows an absence of mistake with respect to those
lower income figures on his filed tax returns.

   C.   The Defendant's Bad Checks Show
        Motive and Intent to Defraud the DSCC

        The defendant wrote checks drawn on insufficient funds to
make some of the payments to his pool contractor.  He wrote the
first check to the contractor on June 11, two days after he
began to receive his $75,000 portion of the $100,000 he took
from the DSCC.  The pool contract required the defendant to make
payments as the construction progressed.  Within weeks, however,
the defendant was out of money and some of the checks he wrote
to the pool contractor bounced.  The defendant similarly failed
to pay the final $6,000 towards the $40,000 home theater he was
having installed at the same time as the pool was being
installed.

        The fact that the defendant was bouncing checks, even
after he stole $75,000 from the DSCC, shows that he did not have
sufficient funds to pay for the pool, the home theater, the
basement renovations and the related furniture and electronics.
That need for money, as demonstrated by the bad checks, provides
a motive to defraud the DSCC and to understate his income on his
2007 through 2009 tax returns.  The defendant's motive to
defraud the DSCC is probative of the defendant's intent to
defraud the DSCC.  Further, evidence of the defendant's need for
funds, as proven with the bounced checks, rebuts any defense the
defendant may offer that he intended to use the $75,000 to pay
for political mailers or any other printing services.

   D.   Evidence That the Defendant Charged Personal
        Expenses to his DSCC-Issued Credit Card is
        Admissible to Show Motive and Intent

        Since he had run out of money before his pool and home
theater were finished, the defendant needed to find a way to pay
for the remaining expenses arising from their installation.
From June 26, 2010 through July 4, 2010, the defendant charged
more than $27,000 to his DSCC-issued American Express card to
pay for indoor and outdoor furniture, electronics, billiards
equipment and travel expenses.  When the DSCC received the bill
for these items, it demanded, and received, payment from the

defendant, but not before it paid the defendant a $50,000 "post-filing bonus" of $50,000 on July 21, 2010.

This evidence, like the bad checks, shows that the defendant did not have enough money to pay for the pool, home theater and basement renovation projects.  The defendant's desperate need for funds is proof of the defendant's motive to defraud the DSCC of the $100,000 and, as he developed and executed his plan, his intent to defraud the DSCC.  It also is proof of the defendant's motive to commit the charged tax crimes with respect to his 2007 through 2009 tax returns.  Further, it rebuts any defense the defendant may offer that he intended to use the $75,000 to pay for political mailers or any other printing services.

     E.    The Defendant's Defrauding John Doe is
           Admissible as Direct Evidence of False
           <u>Subscription and as Motive for the Mortgage Fraud</u>

The defendant purchased the 1829 house in part with $66,000 he borrowed from John Doe with the promise that he would repay the money within days.  The defendant knew that he would be unable to keep that promise, as he needed the money to close on the purchase of his Georgia house.  Two months later, the defendant gave Doe two post dated checks for $34,000 each.  Doe deposited the first check, only to watch it bounce.  The defendant then promised to pay Doe back when he had the funds but, despite having sufficient cash balances at times to repay Doe, he never did so.

The Indictment alleges as part of the false subscription charge for the 2007 tax year contained in Count 3 that the defendant "falsely omitted from his 2007 U.S. Individual Income Tax Return the reporting of income in the form of the proceeds of a scheme in which he defrauded John Doe, a resident of Yonkers, New York, of $66,000."  The $66,000 is part of the defendant's total income that he failed to report on his 2007 tax return.  Thus, evidence of the $66,000 and its source is admissible as direct evidence of the false subscription charge.  The source of the funds -- that it was the proceeds of a fraud -- is admissible to show that the $66,000 is properly treated as income to the defendant in 2007 and, therefore, should have been reported on the defendant's 2007 tax return.  <u>See</u> <u>United States v. Slade</u>, 2013 WL 5873576 at **6-7 (E.D.Pa. 2013)(evidence that directly proves charged offense not analyzed under Rule 404(b) analysis).

The fraud against John Doe is also direct evidence of the mortgage fraud charged in Count 9. That count charges that the defendant caused a manager of his bank to state falsely to his mortgage lender that his checking account balance was more than $80,000 when, in fact, the balance was a little more than $2,100. This substantial inflation of the defendant's liquid assets was material for two reasons. First, it confirmed to the mortgage lender that the defendant had sufficient funds on hand to close on the mortgage loan and purchase the home. In fact, the defendant did not have that cash. He stole it from John Doe. Second, the false inflation of the defendant's assets and his failure to disclose his $66,000 liability to John Doe turned the defendant's actual negative net worth into a false positive net worth. Either reason alone would have been enough to cause a reasonable mortgage lender to think twice about whether to lend the defendant money. As a result, evidence of the defendant's fraud against Doe is direct evidence of the materiality of the defendant's false statement regarding his checking account balance. That evidence also is admissible as direct evidence necessary to complete the story of the defendant's mortgage fraud offense. Gonzalez, 110 F.3d at 941 ("[T]he trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment"); Carboni, 204 F.3d at 44 (other crimes evidence admissible to "complete the story" of the charged crime).

     F.    Rule 403 Would Not Preclude
            Any of the Proffered Evidence

Where evidence is offered for a proper purpose, including under Rule 404(b), the trial court may exclude the evidence only if the probative value of the evidence is "substantially outweighed" by the danger of unfair prejudice. The Court of Appeals has repeatedly held that evidence admissible under Rule 404(b) is not unduly prejudicial to a defendant under Rule 403 if the court gives a limiting instruction explaining the proper purpose for the other crimes evidence. See United States v. Pipola, 83 F.3d 556, 566 (2d Cir. 1996); United States v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993).

There is no basis to exclude any of the proffered evidence under Rule 403. First, this evidence is no more sensational than any of the direct evidence concerning the crimes charged in the Indictment. See United States v. Pitre, 960 F.2d 1112, 1120 (2d Cir. 1992)(in narcotics case, evidence of prior narcotics transactions admitted where it "'did not involve conduct any more

sensational or disturbing than the crimes with which [the appellants were] charged"); United States v. Peters, 791 F.2d 1270, 1294 (7th Cir. 1986)(evidence is unfairly prejudicial if it produces an emotional response that would cause the jury to base its decision on something other than the evidence).

The proffered evidence will not significantly expand the length of the trial.  Much of the proffered evidence will be offered through witnesses who are already expected to testify, as well as documents the Government is already planning to offer.  Thus, the admission of the proffered evidence should not materially add to the length of the trial.

G.   Evidence of the Defendant's Expenses
     Would be Irrelevant and Inadmissible

Counts 3 through 5 each charge the defendant with "fraudulently omitt[ing] income he received, thereby substantially understating his total income . . .."  The Government will prove that the defendant failed to report nearly $1,000,000 in gross receipts during those three years from his consulting businesses.  Because tax loss is not an element of the offense, the Government does not intend to prove that the false statements on his tax returns relating to his failure to report gross receipts caused any tax harm.  Based on discussions with defense counsel, however, the Government anticipates that the defendant may seek to introduce evidence of additional unclaimed expenses.  Any such evidence is irrelevant to the pending charges and would only become relevant at the sentencing in this matter.

In order to establish a violation of Title 26, United States Code, Section 7206(1), the Government must establish four elements:

> 1) The defendant made or caused to be made, a federal income tax return for the year in question which he verified to be true; 2) that the tax return was false as to a material matter; 3) that the defendant signed the return willfully and knowing it was false; and 4) that the return contained a written declaration that it was made under the penalty of perjury.

United States v. Pirro, 212 F.3d 86, 89 (2d Cir. 2000).

In <u>United States</u> v. <u>Greenberg</u>, 735 F.2d 29, 31 (2d Cir.
1984), the Court of Appeals explained that materiality is a
function of whether the false statement impacts the IRS' ability
to perform its function, <u>i.e.</u>, the verification of the accuracy
of the reported income and expenses, and not the actual tax
effect of the false statement:

> Where a false statement is made to a public body
> or its representative, materially refers to the
> impact that the statement may reasonably have on
> the ability of that agency to perform the
> functions assigned by law. The question is not
> what effect the statement actually had. . . . The
> question is rather whether the statement had the
> potential for an obstructive or inhibitive
> effect.

<u>Id</u>. at 31; <u>see</u> <u>United States</u> v. <u>Citron</u>, 783 F.2d 307, 313 (2d
Cir. 1986)("purpose of sec[tion] 7206(1) is not simply to ensure
that the taxpayer pay the proper amount of taxes – though that
is surely one of its goals.  Rather, that section is intended to
ensure that the taxpayer not make misstatements that could
hinder the Internal Revenue Service (IRS) in carrying out such
function as the verification of the accuracy of that return or a
related tax return"); <u>United States</u> v. <u>Olgin</u>, 745 F.2d 263 (3d
Cir. 1984) (proof of tax deficiency is not required, thus
evidence of additional expenses is irrelevant).

Accordingly, evidence of expenses incurred by the defendant
would be irrelevant and should be precluded from the trial.
Further, evidence of expenses would serve to confuse the issues,
mislead the jury and waste time and therefore should also be
precluded under Rule 403.

H.   Evidence Relating to the Tax Preparer's
     <u>Unrelated Conviction is Irrelevant</u>

The defendant's tax preparer has been convicted of various
false subscription and theft of government fund counts and is
now serving a 30 month prison sentence.  <u>United States</u> v.
<u>Mofunanya</u>, 13 Cr. 111 (JGK).  The indictment in that case
alleged that the defendant used his tax preparation business to
file fraudulent corporate returns for various companies that he
owned and controlled.  These corporate returns were fraudulent
in that they contained false claims for federal fuel tax
credits.

15

Mofunanya's fraud is wholly unrelated to the defendant's crimes.  The Government does not intend to offer his testimony. Mofunanya's conviction is therefore irrelevant to this case. Further, evidence of the conviction would serve to confuse the issues and mislead the jury and therefore should also be precluded under Rule 403.  Unless circumstances change that would somehow render the conviction relevant and not confusing or misleading, the defendant should be precluded from offering evidence relating to it or from mentioning it in front of the jury.

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney
                              Southern District of New York


                  By:          /s/
                              James McMahon/Perry A. Carbone
                              Assistant United States Attorneys
                              (914) 993-1936/1945

cc:  Theodore Greene, Esq. (by ECF)